UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANTONY JOSEPH,　　　　　　　　　　　　　　　　No. 1:19-cv-11839-PBS
　　　Plaintiff,

　　v.

THOMAS A. TURCO III, et al.,
　　　Defendants.

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Thomas Turco III, Steven Kenneway, Steven Silva and Daniel Bennett[1] ("Defendants") hereby oppose plaintiff's motion for preliminary injunction.

## INTRODUCTION

This is motion arises out of a pending complaint brought by Santony Joseph, an inmate lawfully incarcerated with the Department of Correction ("Department"), who is currently housed in the Department Disciplinary Unit ("DDU") at the Massachusetts Correctional Institution at Cedar Junction in Walpole, MA. Plaintiff has been in the DDU since July 12, 2019; however, for all times relevant to this complaint he was housed at the Souza-Baranowski Correctional Center ("SBCC"). In the complaint, the plaintiff alleges that the Department failed to protect him by placing him in general population at SBCC on four separate occasions resulting in him being assaulted by other inmates. The plaintiff is seeking emergency injunctive relief to prohibit the Department from returning him to SBCC. For reasons outlined below, the

---

[1] Defendant Steven Kenneway is the only defendant who has been properly served. Assuming Turco, Silva and Bennett are timely served and incorporated into this claim, undersigned counsel will also represent them and therefore opposes this motion on their behalf as well.

plaintiff's request is unfounded and inappropriate at this time and this Court should deny the request.

## ARGUMENT

**I.     PRELIMINARY INJUNCTION STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and quotations omitted). To be entitled to a preliminary injunction, the moving party must demonstrate the following familiar four criteria: (1) a likelihood of success on the merits; (2) irreparable harm to the plaintiff should interim relief not be granted; (3) that the harm to plaintiff outweighs any harm which granting interim relief would inflict on the defendants; and (4) the public interest will not be adversely affected by the granting of the injunction. *Rio Grande Comty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 75 (1st Cir. 2005); *Jackson v. Fair*, 846 F.2d 811, 814-815 (1st Cir. 1988). All of these elements must be decided in plaintiff's favor if he is to obtain the injunctive relief he seeks.

Further, the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, limits the scope of prospective relief. The PLRA states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). The Supreme Court has held that "the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs

2

before the court." *Brown v. Plata*, 131 S.Ct. 1910, 1940 (2011). "In essence, § 3636(a)(1)(A) requires that a court find a violation of a federal right before ordering any prospective relief and then narrowly tailor the remedy ordered to assure that it does no more than correct that violation." *Disability Law Center v. Mass. Dept. of Correction*, No. 07-10463, 2012 WL 1237760, *11 (D. Mass. 2012).

## II.  GRANTING A PRELIMINARY INJUNCTION WOULD CAUSE GREATER HARM TO THE DEFENDANTS THAN THE PLAINTIFF AND WOULD ADVERSELY AFFECT THE PUBLIC INTEREST.

Massachusetts General Laws c. 127, §§ 20 and 97 give the Commissioner of Correction the discretion to classify inmates within a correctional facility and to transfer inmates from one correctional facility to another. "[T]he decision to transfer a prisoner by the Commissioner is a simple exercise of his administrative discretion made numerous times for varied reasons such as security, convenience, and rehabilitation." *Jackson v. Comm'r of Corr.*, 388 Mass. 700, 703 (1983) *citing Meachum v. Fano*, 427 U.S. 215 at 228. "Since a prisoner has no right or expectation under state law that he will not be transferred except for misbehavior or the occurrence of some specified event, there is no liberty interest to which due process rights attach and which can be infringed by transfer." *Nelson v. Comm'r of Corr.*, 390 Mass. 379, 397 (1983).

Correction officials have absolute discretion to place prisoners within the correctional system, and transfers do not implicate any protected liberty interest nor trigger any due process protection under either the state or federal constitutions. M.G.L. c. 127, § 20; *Montanye v. Haymes*, 427 U.S. 236, 242 (1976) (transfer to another prison does not implicate due process rights); *Olim v. Wakinekona*, 461 U.S. 238, 245-248 (1983) (transfer to out of state prison does not implicate due process rights.); *Four Certain Unnamed Inmates of Mass. Correctional Institution v. Hall*, 550 F.2d 1291

3

(1st Cir. 1977) (transfer to segregation in a Massachusetts prison does not implicate due process rights); *Lombardo v. Meachum*, 548 F.2d 13 (1st Cir. 1977) (transfer to another Massachusetts facility does not implicate due process rights). In exercising its discretion and pursuant to M.G.L. c. 124, 1(f), 1(g) and 1(q), and M.G.L. c. 127, §§ 20 and 97, the Department has adopted regulations entitled <u>Classification</u>, 103 CMR 420.00, wherein inmates are reviewed at least every year, subsequent to their initial classification, to assess, among other things, their security requirements and programmatic needs, so that an inmate can be placed in the most appropriate facility.[2]

The major goal of the classification process is to "promote public safety and the responsible integration of inmates. To achieve these goals, the classification process shall objectively assess the inmate's custody requirements and programmatic needs and match those to the appropriate security level in a manner that minimizes the potential for escape, prison violence, and inmate misconduct." *See* 103 CMR 420.06. To this end, each inmate is classified within 28 – 90 days upon entry to the Department of Correction, and then re-classified each year after that. The initial classification process involves individual assessment, testing and structured interviews as well as review of the inmate's pre-sentence summary report, the official version of the crime they are sentenced to, prior incarceration records, and the inmate's six-part folder *See* 103 CMR 420.07; the six-part folder is a confidential Department folder containing the inmate's court case information, classification and personalized program plan, CJIS and FBI identification information, inmate correspondence with the Department, disciplinary actions, and activities and programming *See* 103 CMR 155.00. A risk assessment is

---

[2] There are certain events that may also trigger the need for a new classification review/board.

then completed on all male inmates incarcerated for more than a year and the inmate's Objective Point Base Score (OPBS) is determined; the OPBS is a score given each inmate based on classification variables, potential overrides and restrictions *See* 103 CMR 420.07. All of the above information is presented to the Classification Board who will then conduct a hearing and make a recommendation to the Commissioner, or her designee, as to where the inmate should be placed *Id*. The inmate is given at least 48 hours notice of the hearing. The inmate is required to attend the hearing, is encouraged to participate in the hearing process and made aware of the appeal process should he disagree with the Classification Board's decision *Id*. The Commissioner, or her designee, then makes a final placement decision in consideration of the Board's recommendation and all the information on the inmate described above including any preference or statement by the inmate *Id*. After the initial classification, an inmate's classification is reviewed each year. During the review, all the information above is verified and reviewed as well as the inmate's current housing evaluations, disciplinary history since arrival, segregation placements, if any, and a new risk assessment *See* 103 CMR 420.08. If an inmate is placed in the DDU, he receives a classification board hearing 60 days prior to his release from the DDU, in addition to his yearly classification reviews, to ensure he is placed in the appropriate institution upon release from the DDU *Id*.

Courts recognize that deference is due prison administrators in their attempts to secure the safety of prison staff, and to preserve discipline in the prisons. *Sires v. Berman*, 834 F.2d 9, 14 (1st Cir. 1987), citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979). Prison administrators are accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain

5

institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). If this Court were to become involved in areas that are properly the sole province of the Department, such as the classification and placement of inmates, it could infringe upon the Department's ability to safely and properly operate the institutions involved. As discussed above, classification and housing decisions are factually dependent on many factors known to Department officials that would not normally be known to the Court. In addition, the information is fluid and can change at any point as the inmate's progress, or lack thereof, can change. A court-ordered placement or restriction on placement could, among other things, potentially place the plaintiff in danger or potentially place another inmate in danger by virtue of a placement from the Court that is not fully informed of the Department's classification process.

In addition, granting plaintiff's injunction would do a great disservice to the public, which has a strong interest in having experienced and qualified prison administrators deal with the day-to-day operation of prisons and prison procedures. Through the classification process, Department administrators have access to the terms of the plaintiff's incarceration, his prior incarceration history, potential enemies and where they are housed, and current or potential threats through-out the Department of Correction; therefore, Department administrators are in the best position to make informed and accurate housing assignments for this plaintiff that will allow for everyone's safety, which is in line with the public interest.

### III.   PLAINTIFF CANNOT DEMONSTRATE AN IRREPARABLE HARM SHOULD AN INJUNCTION NOT BE GRANTED.

The plaintiff is currently housed in the DDU, the Department Disciplinary Unit. The DDU is a separate housing unit for inmates who have received a sanction, after a guilty finding,

for committing a prohibited behavior/action. *See* 103 CMR 430.00. The DDU, while housed within a penal institution, is in fact a separate entity. DDU inmates are not allowed access to any inmates outside of the DDU; this includes other inmates housed within the same institution. They are housed in single bed cells, have one hour of recreation time outside of their cells in a confined and restricted area, are in restraints and under officer escort whenever transported and are not allowed to co-mingle with other DDU inmates. An inmate sanctioned to the DDU is there for a pre-determined time, to serve his disciplinary sanction, and then re-classified prior to returning to a housing placement.

The basis of the plaintiff's motion for preliminary injunction is his claim that the DDU is closing and therefore he will be returned to SBCC; this claim has no merit and therefore the plaintiff cannot demonstrate an irreparable harm. In fact, the DDU is not closing. The DDU is currently located within MCI Cedar Junction. The Department has plans to move the DDU to SBCC; however, this move would still not be an impetus for the plaintiff's motion. The plaintiff was sanctioned to the DDU for a period of 15 months, 12 months to serve, after being found guilty of assaulting an inmate with a weapon. He began his DDU sentence on July 12, 2019 and is scheduled to be released from the DDU on June 21, 2020. As stated above, the plaintiff will receive a classification board hearing 60 days from his DDU release date, at which point his post-DDU housing will be determined. Consequently, the plaintiff will be housed in the DDU until at least June 21, 2020. The Department does not plan to move the DDU until the summer of 2020. When the DDU is relocated to SBCC, the structure, including its total segregation from the general population, will remain exactly the same. Therefore, even if the plaintiff were still housed in the DDU when the unit is moved to SBCC, he would not have access to any inmate at

SBCC who was not in the DDU, and the inmates at SBCC would not have access to him. The plaintiff would have no reason to fear anyone housed at SBCC due to the DDU relocating there regardless of when the move happens. Consequently, he is not exposed to any danger by virtue of the DDU moving and that move is not scheduled to happen until next summer. The plaintiff is currently serving his sentence in the DDU where he will remain until at least June, 2020 and simply cannot demonstrate any irreparable harm should he not receive a preliminary injunction. There is simply no immediacy warranting a preliminary injunction under these circumstances.

## **CONCLUSION**

For all the foregoing reasons, the defendants request that the plaintiff's motion for a preliminary injunction be DENIED.

Respectfully submitted,

                                              Defendants
                                              By their attorneys:
                                              NANCY ANKERS WHITE
                                              Special Assistant Attorney General

Date: December 17, 2019

                                              /s/ Charles W. Anderson Jr.
                                              Charles W. Anderson Jr., Sentencing Counsel
                                              Department of Correction
                                              70 Franklin Street, Suite 600
                                              Boston, MA 02110-1300
                                              (617) 727-3300, Ext. 1161

Mass. BBO # 635016
Charles.anderson@massmail.state.ma.us

/s/. *Tonya Rutherford*
Tonya Rutherford BBO# 665958
Department of Correction
70 Franklin Street, Suite 600
Boston, MA 02110-1300
(617) 727-3300, Ext. 1107

**CERTIFICATE OF SERVICE**

I, Charles Anderson, counsel for the defendants hereby certify that on this 17th day of December, 2019, I did serve this document through the Court's electronic filing system (ECF) on all persons so registered and via first class mail to the pro se plaintiff Santony Joseph to him at his address: MCI Cedar Junction, P.O. Box 100 Route 1A Main Street, South Walpole, MA 02071.

Date: December 17, 2019    /s/ Charles Anderson
Charles Anderson